AARON D. FORD
  Attorney General
DOUGLAS R. RANDS, Bar No. 3572
  Senior Deputy Attorney General
State of Nevada
100 N. Carson Street
Carson City, NV 89701-4717
Tel: (775) 684-1150
E-mail: drands@ag.nv.gov

*Attorneys for Defendants*
*Renee Baker, Tara Carpenter,*
*Dawn Bequette, Tim Garrett,*
*and Kara LeGrand*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| NATHANIEL WILLIAMS,<br><br>    Plaintiff,<br><br>v.<br><br>TIM GARRETT, et al.,<br><br>    Defendants. | Case No. 3:22-cv-00264-CLB<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR EXTENSION OF TIME TO FILE DISPOSITIVE MOTION**<br>**(First Request)** |

    Defendants Renee Baker, Tara Carpenter, Dawn Bequette, Tim Garrett, and Kara LeGrand, by and through counsel, Aaron D. Ford, Attorney General of the State of Nevada, and Douglas R. Rands, Senior Deputy Attorney General, move this Court for an extension of time to file dispositive motions. (First Request). This Motion is made and based upon Federal Rules of Civil Procedure 6(b)(1)(A), the attached Points and Authorities, the papers and pleadings on file herein, and such other and further information as this Court may deem appropriate.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    FACTUAL ANALYSIS**

    This is a *pro se* prisoner civil rights action brought by Nathaniel Williams (Williams), asserting claims arising under 42 U.S.C. § 1983. In the First Amended Complaint, Williams sued multiple defendants for events that allegedly took place while he was incarcerated at Lovelock Correctional Center ("LCC"). (ECF No. 5-1 at 1-3.). Williams sued Warden Tim Garrett, Associate Warden Tara Carpenter, Associate Warden Kara LeGrand, Caseworker Maria Ward, Law Library

1

Supervisor D. Bequette, Warden Renee Baker, the State of Nevada, and N. Gallagher. (*Id.*). Williams brought six claims and seeks monetary, declaratory, and injunctive relief. (Id. at 24-42.). Williams alleges the following. In December 2019, Williams was appointed pro bono counsel in a civil-rights action in this district. (Id. at 2.). To demonstrate the "strength of [his] case [ ]" and obtain advice on "other lawsuits," Williams claims he gathered 166 pages of documents that he planned to send to his appointed counsel. (Id. at 2, 5.). The documents allegedly included (i) "confidential grievances" discussing "medical, dental, [and] mental health issues for which [Plaintiff] was seeking help"; (ii) "confidential reports" concerning "sexual abuse" that Williams had experienced as a child and an adult; (iii) "sensitive statements and information" about Williams' "protective custody history" that, if revealed, would "get [him] publicly labeled a snitch/informant"; (iv) kites detailing "undisclosed contagious disease information" as well as "sexual abuse" Williams had endured while incarcerated; and (v) "identifying information such as children['s] names, family addresses, and [Plaintiff's] Social Security number and date of birth." (Id. at 4-6.).

On December 18, 2019, Williams claims he sent his documents to the law library so that they could be copied and mailed to his attorney. (Id. at 6.). Williams argues the law library is "prohibited from making copies [of documents] that are not considered legal in some way." (Id. at 20-21.). He further argues that the law library routinely copies documents containing "a significant amount of sensitive, private, and confidential information," including medical records, "protective custody history," legal correspondence, and "confidential reports" concerning "snitching" and "enemy information." (Id. at 17-18.).

One day later, on December 19, 2019, Williams asserts Inmate Young approached Williams' cell door with a stack of papers in his hand. (Id. at 6.). Williams says he grabbed the stack and flipped through the pages, which were "neatly cut in half." (Id.). He claims he quickly realized he was holding copies of the documents he had sent to the law library the day before. (Id.). Young allegedly explained that he had received the documents from a Muslim inmate, who told him that the LCC "school" had been using the documents as scratch paper. (Id.). Young also reportedly said that, according to the Muslim inmate, "other inmates were trying to return to the rightful inmates' papers being handed out as scratch paper at the school." (Id.).

Williams alleges he tried to discuss this with his caseworker, but was told "it no longer matter[ed], because the law library already knew of the matter, [and] it was an old issue." (Id. at 8.). The Caseworker explained that she had just spoken to Bequette, the law library supervisor. According to Williams, Bequette had told her that "bad copies" of documents—i.e., "pages with lines, marks, or other copy machine errors"—went to a "junk pile to be sorted," with "confidential papers" going to the shredder. (Id. at 8, 26.). "Inmate workers" were responsible for "separat[ing] the papers in the junk piles so that confidential papers [were] shredded and junk papers [were] recycled." (Id. at 13.). Once the sorting was complete, the law library sent its "junk piles" to "school classrooms," where inmates used the "recycled" documents as scratch paper. (Id. at 8.). According to Bequette, Williams' confidential documents ended up as scratch paper because "bad copies" of the documents "were not shredded by mistake." (Id.).

His caseworker allegedly told Williams that this policy—which had been approved by Carpenter, Baker, Garrett, Gallagher, and LeGrand—was designed to "save a buck" for the NDOC. (Id. at 8, 12-13.). She then allegedly "dismissed" Williams, saying that "they apologized" and he would "have to live with it." (Id. at 8.). Williams claims he then asked the caseworker to make sure that no other copies of his "personal documents" were lying around, but she "refused to take further action." (Id.).

Shortly after this incident, Williams claims he began to experience "hostile treatment" from his fellow inmates. (Id. at 11.). Some inmates "taunted" Williams about "private undisclosed medical facts, mental health issues, [Prison Rape Elimination Act] complaints, [and] confidential reports." (Id.). Other inmates called him a "snitch" and threatened him. (Id. at 11, 13.). On one occasion, he claims a group of inmates threw "a cup with liquid" at him. (Id. at 13.).

Sometime later, Williams claims he "verbally challenged" Bequette about the law library's scratch-paper policy. (Id. at 13.). Inmates who worked in the law library allegedly told Williams that Bequette had "complained to them about [his] grievances and how it [could] get all of them in trouble." (Id.). Bequette also reportedly told the "workers" that Williams was "pushing the issue." (Id. at 14.). As a result, Williams claims to have experienced "additional ostracism, threats, and labels of 'snitch.'" (Id.). Some inmates asked Williams to "stop pressing the issue" and "telling on

3

them." (Id.). Williams alleges the law library eventually ended the policy of "providing scratch paper to the school for the inmates." (Id.).

Based on these allegations, Williams asserted (i) a Fourteenth Amendment right-to-privacy claim, (ii) a First Amendment claim for interference with outgoing legal mail, (iii) an Eighth Amendment claim for deliberate indifference to inmate safety, and (iv) several state-law tort claims. (Id. at 24-41.)  In screening, Williams was allowed to proceed on the Fourteenth Amendment right-to-privacy claim against Defendants Bequette, Carpenter, Baker, Garrett, Gallagher, and LeGrand. He was also allowed to proceed on the First Amendment claim for mishandling of outgoing legal mail against Defendants Bequette, Carpenter, Baker, Garrett, Gallagher, and LeGrand. Finally, he was allowed to proceed on the Eighth Amendment claim for deliberate indifference to inmate safety against Defendants Bequette, Carpenter, Baker, Garrett, Gallagher, and LeGrand.

On June 23, 2023, this Court issued a Scheduling Order, (ECF No. 29).  Then, on November 30, 2023, after Defendants responded to Williams' second amended complaint, this Court issued an order extending discovery and ordered that dispositive motions must be filed no later than Wednesday, April 17, 2024. (ECF No. 40). The Defendants have begun to draft their dispositive motion. However, Counsel is preparing for a Jury trial to begin April 15, 2024, in Case No.  3:19-cv-00063-MMD-CLB, *Hammons v. Dante*. Due to the trial and preparation for the trial, Counsel will not be able to properly prepare the necessary dispositive motion. Therefore, Counsel requests an additional 30 days to file the dispositive motion.

II. **LEGAL ANALYSIS**

Federal Rule of Civil Procedure 6(b)(1) governs extensions of time and provides as follows:

> When an act may or must be done within a specified time, the court may, for good cause, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or (B) on motion made after the time has expired if the party failed to act because of excusable neglect.

Further, the Local Rules of Practice require a showing of good cause for a request made within 21 days of the subject deadline. LR 26-3. Finally, this Court noted in the November 30, 2023, extension that "[n]o further extensions of time will be granted absent extraordinary circumstances." ECF No. 40 at 1:23.

4

Good cause exists to grant the requested extension of time, which is filed within 21 days of the subject deadline. Defendants' request for a brief extension of time will not hinder or prejudice Plaintiff's case but will allow for a thorough opportunity to file a complete dispositive motion. The requested extension of time should permit the Defendants time to adequately gather the required declarations and prepare the motion. Defendants assert that the requisite good cause is present to warrant the requested extension of time. Further, extraordinary circumstances exist for the extension based on the upcoming trial noted in paragraph I *supra*. In light of this situation, it is respectfully asserted that a short extension is warranted. Therefore, a 30-day extension is requested. This is Defendants first request to extend any deadline established in the November 30, 2023, scheduling order.

### III. CONCLUSION

Defendants asserts that the requisite good cause and extraordinary circumstances are present to warrant the requested extension of time. Therefore, Defendants request an extension to file his dispositive motion. The Defendants request an extension of 30 days, or to **Friday, May 17, 2024,** to file their dispositive motion.

DATED this 12th day of April, 2024.

AARON D. FORD
Attorney General

By:   /s/ *Douglas R. Rands*
DOUGLAS R. RANDS, Bar No. 3572
Senior Deputy Attorney General

*Attorneys for Defendants*

### ORDER

The deadline for Defendants to file a dispositive motion is now Friday, May 17, 2024.
**IT IS SO ORDERED.**
**DATED:** April 15, 2024.

_____
UNITED STATES MAGISTRATE JUDGE

Case 3:22-cv-00264-CLB   Document 48   Filed 04/15/24   Page 6 of 6

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on April 12, 2024, I electronically filed the foregoing, Defendants' Motion for Extension of Time to File Dispositive Pleading (First Request), via this Court's electronic filing system. Parties that are registered with this Court's electronic filing system will be served electronically. For those parties not registered, service was made by depositing a copy for mailing in the United States Mail, first-class postage prepaid, at Carson City, Nevada, addressed to the following:

Nathaniel Williams, #90540
2000 Vassar Street, #10731
Reno, NV 89510

_/s/_
An employee of the
Office of the Nevada Attorney General

6